IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JUDITH KAJDER | ) | Civil Action No. 04-549 |
| | ) | Magistrate Judge Caiazza |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| COMMUNITY COLLEGE OF | ) | |
| ALLEGHENY COUNTY, | ) | |
| | ) | |
| DEFENDANT | ) | |

## MEMORANDUM OPINION

Judith Kajder held the full time position of System Job Coordinator at the Community College of Allegheny County ("CCAC") from February 1999 until her termination in March 2001.  She alleges that her termination was the result of race and age discrimination. She also claims that she was terminated in retaliation for her complaints of race discrimination. The actions alleged are proscribed by Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §2000e et seq., the Pennsylvania Human Relations Act ("PHRA"), 43 Con. Stat. Ann. §951 et seq., and the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 et seq. CCAC's Motion for Summary Judgement is pending.  Because the court finds that Kajder has failed to establish a prima facie case with respect to any of the alleged causes of action, it will grant the Motion for Summary Judgment.

## I. Background

In March 1999, Judith Kajder ("Kajder"), then a fifty-three year old white woman, was hired to work full-time at the Braddock location of CCAC in a year-to-year grant-funded position. Her primary responsibilities focused on helping displaced homemakers, single mothers, and other job seekers to secure employment. She taught classes in resume preparation, time management, stress management, and other related areas. (Kajder Dep. 41). Her supervisor, Dr. Sheila L. Johnson ("Johnson"), was black.

Within months following Kajder's employment, it was clear that there was friction in her relationship with Johnson. The email exchanged between the women beginning in September 1999 shows that the two spent a significant amount of time sparring over what work needed to be done, and when, how, and by whom the work would be accomplished. (Kajder Br. in Opp. to Mot. for Summ. J. Ex. 2). The court is left with the impression that Johnson was difficult to satisfy, finding fault with much that Kajder undertook, and changing expectations mid-project. Kajder, in turn, was fiercely resentful of what she saw as Johnson's frequent, unwarranted, and sometimes public interference in her work.

According to Kajder, Johnson applied "irrational policies" only to her. She alleges that she was not permitted to fax as

many pages as other members of the staff and was denied permission for her son to attend a class, a perquisite included in her benefit package. She also contends that she was not allowed to attend professional development seminars, taught more classes than other employees, was subjected to public criticism, and was given lengthy assignments that could not be completed in the given time frame. (Kajder Opp. to Mot. Summ. J. Ex. 6). Kajder's irritation with Johnson was severe enough that she began to forward their correspondence to Jeanne Shader, CCAC's Director of Human Resources, seeking advice about how to handle the tension. Shader did not offer a solution, and asked that Kajder stop forwarding email. (Id.)

   Kajder came to believe that many of Johnson's decisions were the result of racial bias. According to Kajder, Johnson stated that "all white women look alike," (Kajder Dep. 46), and once referred to Bethel Park women entering the program as "white women on Prozac."(Id., 150). Kajder believes that she also heard about Johnson's terminating only white students from the program, calling them "incompetent."

   Later in October, Kajder was told of an alleged incident that seemed to confirm her belief that Johnson was racially biased. Three white woman had been denied admission to the jobs program, allegedly because their income level exceeded applicable guidelines. At about the same time, Johnson's friend, a black woman, was admitted though her income was even higher than the

income of any of the white women. (Compl. ¶ 17).

In January 2001, the simmering difficulty between Kajder and Johnson approached the boiling point when Kajder began to suspect that Johnson's resume did not reflect her actual background. Perhaps this was because Johnson allegedly had an unusually strong reaction when she heard a comment that Kajder made to students about the dangers of resume fraud.(Kajder Opp. to Mot. Summ. J. Ex. 6). This suspicion was reinforced by Johnson's alleged breach of confidence in a counseling session, which made Kajder question whether Johnson had a masters degree in counseling. (Kajder Dep. 95-205).

Kajder and her husband began to investigate the veracity of Johnson's credentials, visiting the University of Pittsburgh's library to read her doctoral thesis, contacting the schools listed on her resume, reviewing her transcripts, and traveling to Harrisburg to review grant applications listing Johnson's qualifications. (Kajder Dep. 85-87, 90, 91, 222, 223, 227). Based on their findings, the Kajders concluded that Johnson had misrepresented the areas of study in which she had obtained advanced degrees. Kajder went to Shader with her resume-related findings in February.[1] (Id. 195-205). She also complained that Johnson had scheduled CCAC's Penn Hills classes in her husband's church, calling it the "West Penn Hills location," so that the

---

[1] After Kajder's meeting with Shader, the College conducted its own review of Johnson's educational background, and was satisfied that Johnson had accurately reported her credentials both on her resume and in documents relating to CCAC grant applications.

church could collect rent from CCAC. (Kajder Dep. 102).

By this point, Johnson and Kajder had abandoned any pretense of collegiality. Johnson was determined that Kajder not have a March vacation day that had been requested repeatedly, beginning the previous fall. She imposed condition after condition, each more unreasonable than the last, on Kajder's ability to take the day. Kajder, frustrated to the breaking point, consulted Jeff Kandra ("Kandra'" in Human Resources about the vacation impasse. (Kajder Dep. 83).  She remembers that he advised her to take the time as a personal day because these days did not require the supervisor's prior approval. Knowing that Johnson objected strongly to her being absent for any reason, Kajder took a personal day. (Kajder Resp. to CCAC Stmt. of Facts ¶ 41).

While Kajder was away, Johnson placed three letters of reprimand in her personnel file. (Kajder Opp. to Mot. for Summ. J. Ex. 13). One letter related to Kajder's having taken a member of Johnson's support staff with her to a meeting, allegedly in violation of Johnson's instructions. Another related to Kajder's taking the disputed day of personal leave, and the third involved her failure to report for a meeting that Johnson allegedly insisted take place immediately after Kajder completed an interview for Johnson's position. On March 26, 2002, Johnson sent Kajder a letter of termination citing her "inability to adapt to the program's operating style." (Amended Ans. Ex. A) Although Kajder applied for other job openings at CCAC, she was not hired.

(Kajder Stmt. of Facts ¶ 90).

In early April 2001, Kajder filed a complaint with the Pennsylvania Human Relations Commission ("PHRC") alleging that she had been "discharged . . . and denied alternative jobs because of her race, gender, age, and in retaliation for going to the [PHRC] and for reporting . . . credentials fraud." (PHRC Compl. ¶ B.)(App. to Kajder Stmt. of Facts 94-99). Following an investigation, the PHRC did not find probable cause to conclude that Kajder had suffered the discrimination. (Id. 101 -105).

## II. Standard of Review

Summary judgment is appropriate only where the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits demonstrate that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The mere existence of some evidence favoring the non-moving party will not defeat the motion. There must be enough evidence with respect to a particular issue to enable a reasonable jury to find in favor of the non-moving party. Anderson v. Liberty Lobby., 477 U.S. 242, 248 (1986). A motion for summary judgment will be granted where the materials in the record, if reduced to admissible evidence, would be insufficient to satisfy the non-moving party's burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

## III.  The Wrongful Termination Claims

### A. Age Discrimination

In order to avoid summary judgment in favor of CCAC on the discriminatory discharge claims filed pursuant to the ADEA, Title VII, and the PHRA,[2] Kajder must establish by a preponderance of the evidence that: 1) she was a member of a protected class; 2) her employment was terminated; 3) she was qualified for the position from which she was discharged; and 4) she was ultimately replaced by or treated differently than an employee who was not within the protected class so as to permit a reasonable inference of discrimination. Lawrence v. Nat. Westminster Bank N.J., 98 F.3d 61, 65-66 (3d Cir. 1996)(discussing ADEA); Hugh v. Butler Family YMCA, 418 F.3d 265, 268 (3d Cir. 1995)(discussing Title VII).

For purposes of this motion, the court will assume that Kajder has satisfied the first three elements of her ADEA wrongful discharge claim. She has not, however, established the fourth element of the termination claim under any of the relevant statutes. The record is devoid of evidence sufficient to raise an inference that age was a factor in her discharge.

---

[2] "[In] the context of employment discrimination, the ADA, ADEA and Title VII all serve the same purpose - to prohibit discrimination in employment against members of certain classes. Therefore, it follows that the methods and manner of proof under one statute should inform the standards under the others as well. Courts routinely use Title VII and ADEA case law interchangeably when there is no material difference in the question being addressed." Newman v. GHS Osteopathic, Inc., 60 F.3d 153, 157 (3d Cir. 1995). The same is true for the PHRA. "[A]nalysis of an ADA claim applies equally to a PHRA claim." Williams v. Philadelphia Housing Auth. Police Dept., 380 F.3d 751, 761 n.6 (3d Cir. 2004) (quoting Taylor v. Phoenixville School Dist., 184 F.3d 296, 306 (3d Cir. 1999)).

Immediately after Kajder's termination, CCAC began a search for her replacement. While the search was in progress, Kajder's duties were performed in part by other members of her department, and in part by temporary part-time employees who held the title of "Job Placement Facilitator." (Johnson Dep. 88,89), (Lorkovick Dep. 66,67).  After a five month search, the position of System Job Coordinator, Kajder's former position, was filled.

Kajder does not challenge any aspect of the procedure used by CCAC to fill the vacancy created when she was terminated. She simply continues to state that her job was filled by a young black man, ignoring that this man shared temporary part-time duties with a white woman over the age of sixty until another white woman, over the age of forty, was hired to fill the full-time position formerly occupied by Kajder.  The court does not find, and Kajder does not direct us to any other evidence in the record that is even remotely related to age discrimination. Because she has failed to establish a prima facie case of discriminatory discharge based on age, CCAC is entitled to summary judgment on these claims.

### B. Race Discrimination

Kajder next alleges that Johnson's decision to terminate her was based on race. These allegations were not well supported. In support of her discriminatory discharge claim, Kajder cited two comments which she attributes to Johnson, one referring to students from Bethel Park as "white women on Prozac," and another

that "all white people look alike." (Kajder Dep. 46).  She also reported that she had been told that Johnson favored black applicants to CCAC's jobs program by enforcing income ceilings for white women, which were disregarded where the applicant was black.[3] Kajder was unable to corroborate these incidents. Kajder could not remember having seen applicable income guidelines, did not remember the income reported by of any of the women involved, and was not able to produce evidence, other than her own conclusory statements, to support any of the race based allegations. No one else heard Johnson's comments, and Kajder was unable to produce documentary evidence showing differences in applicants' acceptance to the program based on race. These incidents, even if supported by the evidence, would, at best, have been no more than marginally relevant to Kajder's employment discrimination claim;  the evidence upon which she relies pertains to white CCAC <u>applicants</u> or <u>students</u>, not to its white employees.

The only evidence upon which Kajder relies to show that black employees were accorded preferential treatment over white employees, was the fact that Dr. Johnson allowed one or two black employees to take requested vacation, while she denied Kajder's

---

[3]Lorraine Lorkovic, a part time office worker reporting to Johnson and Kajder, remembers this incident, because she was asked to notify the applicants who had been denied admission to the program. She also called the black woman who was admitted, and remembers that this woman's income was higher than that reported by any of the white women. (Lorkovic Dep. 20-25).

request.[4] The record does not show that a vacation request made by a white employee other than Kajder was denied. A number of factors could have figured in decisions regarding vacation days; nothing in the evidence hints that one of these was race.

Kajder's contention that her discharge was motivated by race also lacks merit. As the court has noted, Kajder's full-time replacement was a white woman, as was one of the two part-time employees hired to perform some of Kajder's duties until a replacement could be found.[5] The evidence does not raise an inference of race discrimination. It shows instead a likelihood that Johnson's decision to dismiss Kajder was grounded in their contentious work relationship. As the PHRC noted in its decision, between September 2000 and March 2001, "Johnson . . . documented over a dozen times in which [Kajder] did not comply with her directives." (PHRC Dec. 5).

Kajder's claims alleging discriminatory discharge and disparate treatment based on race are insufficient to establish

---

[4]Although Kajder alleges in her complaint that her job responsibilities were more onerous than those assigned to others, there is nothing in the record to document this allegation or to suggest that job duties were assigned on the basis of race.

[5]The PHRC found that the composition of the program staff was not suggestive of racism. "Prior to [Kajder's] termination [the staff] included seven Caucasians [including Kajder], two African Americans [including Johnson] and two Asians. After [the] termination the staff consisted of eight Caucasians, three African Americans and two Asians." (PHRC Dec.5).

her prima facie case.[6]  CCAC is entitled to summary judgment on these claims as well.

### IV. **The Retaliation Claim**

CCAC contends that this court lacks jurisdiction to review Kajder's retaliation claims because, as to those claims, she has failed to exhaust her administrative remedies. In the complaint filed with the PHRC, Kajder alleged that she had suffered retaliation because she requested sick leave, revealed misrepresentations in Johnson's credentials, and filed a complaint with the PHRC. Here, Kajder modifies those contentions, alleging instead that her termination was effected in retaliation for bringing Johnson's racial prejudice to the attention of CCAC administrator Kandra.

Whether the court has jurisdiction over Kajder's present retaliation claim is determined with reference to the test articulated by the Third Circuit Court of Appeals in Antol v. Perry, 82 F.3d 1291(3d Cir. 1996). If Kajder's present retaliation claim falls "fairly within the scope of the prior [administrative] complaint, or the investigation arising therefrom," it is subject to the court's examination. Id.,at 1295 (citation omitted). Courts have been "cautioned against reading a plaintiff's [administrative] charge too narrowly." Visnikar v.

---

[6]If the evidence adduced is insufficient to establish a prima facie case, it does not, of course, trigger the McDonnell- Douglas burden shifting analysis. See McDonnell-Douglas Corp. v. Green, 411 U.S. 792 (1973).

Dept. Env. Protection, No. 02-963, 2004 WL 438688 *5 (W.D. Pa. Jan. 27, 2002). They must "keep in mind that charges are drafted by one who is not well versed in the art of legal description." Hicks v. ABT Association, Inc., 572 F.2d 960, 965 (3d Cir. 1978). Thus, "the scope of the original charge should be liberally construed." Id. (citation omitted).

An examination of Kajder's PHRC filings establishes that allegations based on racial discrimination were raised in the complaint before the PHRC, and were subject to agency examination and evaluation.  Although the retaliation claim in that filing did not specifically mention race, CCAC was on notice that racial discrimination was at issue, and that Johnson's actions, including terminating Kajder, would be evaluated against the background of those allegations. The PHRC had a full opportunity to assess the question of racial discrimination in the context of the discharge and retaliation claims.  Evidence relating to the present retaliation claim has, in large part, already been presented to and considered by the PHRC. As a result, this court's reexamination of that evidence will neither prejudice CCAC nor interfere with the policies underlying prior administrative review. The court is satisfied that it has jurisdiction to review Kajder's retaliation claim.

Having carefully considered all of the evidence in the record, the court finds that Kajder has failed to establish a prima facie case for retaliation. In order to survive summary judgment, a plaintiff making a retaliation claim pursuant to

Title VII, the ADEA, or the PHRC, must show that: 1) she engaged in a protected activity; 2) she suffered an adverse employment action subsequent to or contemporaneous with the protected activity; and 3) that there is a causal link between the protected conduct and the adverse action. Fasold v. Justice, 409 F.3d 178, 189 (3d Cir. 2005).

Kajder maintains that she engaged in protected speech when she discussed Johnson's discriminatory attitude and conduct with CCAC's Human Services employee Kandra.  According to Kajder, when Johnson discovered that she had been accused of racial favoritism, she terminated Kajder's employment. The evidence does not support these allegations. Both of CCAC's Human Services representatives, Shader and Kandra, testified at their depositions that they do not remember Kajder raising the issue of race in her discussions with them. (Shader Dep. 27)(Kandra Dep. 12). Kajder herself admits that she did not discuss race discrimination with Shader. (Kajder Stmt. Facts ¶ 76). The evidence shows that the only person who remembers a discussion of race prior to her termination is Kajder herself. Her recollection alone is not sufficient to establish that she engaged in protected activity by reporting Johnson's racial favoritism, or that her termination was in retaliation for this discussion. Harter v. GAF Co., 967 F2d 846, 852 (3d Cir. 1992).

### V. Conclusion

Judith Kajder and Sheila Johnson apparently did not like or respect one another.  The law, however, does not require that supervisors like or respect their employees.  It requires only that they refrain from treating them differently because of their race, gender, age, or any other characteristic which the law deems to be protected.  <u>Hanson v. Sports Authority</u>, 256 F. Supp. 2d 927, 933 (W.D. Wisc. 2003). The law also does not require that supervisors tell the whole truth regarding the decision to terminate an employee. "Individual decision-makers may intentionally dissemble in order to hide a reason that is nondiscriminatory or small-minded, such as back-scratching, log-rolling, horse-trading, institutional politics, envy, nepotism, spite, or personal hostility." <u>Roman v. Cornell Univ.</u>, 53 F. Supp. 233, 242( N.D.N.Y. 1999)(quoting <u>Fisher v. Vassar College</u>, 114 F.3d 1332, 1337 (2d Cir. 1997)).

It is not important that the court determine what motivated Johnson's decision to terminate Kajder.  What <u>is</u> important is that there is nothing in this record to suggest that Kajder was treated differently, terminated, or retaliated against as a result of her race or age. Accordingly, CCAC is entitled to summary judgment.

For the foregoing reasons, **IT IS HEREBY ORDERED THAT** the Motion for Summary Judgment filed by CCAC (Doc. 21 ) is **GRANTED.**

SO ORDERED this 22nd day of December, 2005.

<u>S/ Francis X. Caiazza</u>

Francis X. Caiazza
U. S. Magistrate Judge

cc:

Joseph H. Chivers, Esq.
Suite 600
312 Blvd. Of the Allies
Pittsburgh, PA 15222-1110

W. Timothy Barry, Esq.
Shon K. Worner, Esq.
W. Timothy Barry & Associates, LLC
161 Hillpointe Drive'
Canonsburg, PA 15317